(No. 79592

JAMES McNAMEE *et al.*, Appellees, v. THE STATE OF ILLINOIS *et al.*, Appellants.

*Opinion filed October 18, 1996.*

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for appellants.

Richard J. Puchalski, of Sklodowski, Franklin, Puchalski & Reimer, of Chicago, for appellees.

Beth Anne Janicki, of Springfield, for *amicus curiae* Illinois Municipal League.

JUSTICE NICKELS delivered the opinion of the court:

In this appeal, we decide whether an amendment to section 3—127 of the Illinois Pension Code (Pub. Act 87—1265, eff. January 25, 1993 (amending 40 ILCS 5/3—127 (West 1992))) violates section 5 of article XIII of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5). Plaintiffs include the Illinois Police Pension Fund Association, the Palos Heights and Streamwood police pension funds and several current and retired police officers from various municipalities throughout Illinois. Plaintiffs filed a complaint in the circuit court of Cook County seeking declaratory and injunctive relief against the defendants, the State of Illinois, Governor Jim Edgar, and the Director of Insurance, Stephen Selcke. The circuit court granted plaintiffs' motion for summary judgment, finding that the amendment to section 3—127 diminished and impaired the contractual rights of the pension fund participants in violation of the Illinois Constitution. Defendants appealed directly to this court pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). We reverse.

## BACKGROUND

The Illinois Pension Code (40 ILCS 5/1—101 *et seq.* (West 1994)) codifies laws relating to the creation and

maintenance of pension funds for the benefit of state and municipal employees and their dependents. This appeal involves article 3 of the Pension Code, which applies to the maintenance of police pension funds by municipalities with populations of 500,000 and under. 40 ILCS 5/3—101 *et seq.* (West 1994). These police pension funds are financed through employee salary deductions and municipal tax levies. 40 ILCS 5/3—125 (West 1994). At issue is an amendment to section 3—127, which involves the accumulation of a reserve to pay off a fund's accrued liabilities. Prior to January 25, 1993, section 3—127 provided:

"Reserves. The board shall establish and maintain a reserve to insure the payment of all obligations incurred under this Article. The reserve to be accumulated shall be equal to the estimated total actuarial requirements of the fund.

If a pension fund has a reserve of less than the accrued liabilities of the fund, the board of the pension fund, in making its annual report to the city council or board of trustees of the municipality, shall designate the amount needed annually to insure the accumulation of the reserve to the level of the fund's accrued liabilities over a period of 40 years subsequent to January 1, 1980, for pension funds then in operation, or subsequent to the date of establishment in the case of a fund created thereafter, so that the necessary reserves will be attained over such a period." 40 ILCS 5/3—127 (West 1992).

The General Assembly amended section 3—127 effective January 25, 1993 (Pub. Act 87—1265, eff. January 25, 1993). As a result of that amendment, the second paragraph of section 3—127 was changed to provide:

"If a pension fund has a reserve of less than the accrued liabilities of the fund, the board of the pension fund, in making its annual report to the city council or board of trustees of the municipality, shall designate the amount, *calculated as a level percentage of payroll, needed annually to insure the accumulation of the reserve to the level of the fund's accrued liabilities over a period of 40 years*

*from July 1, 1993 for pension funds then in operation,* or from the date of establishment in the case of a fund created thereafter, so that the necessary reserves will be attained over such a period." (Emphasis added.) 40 ILCS 5/3—127 (West 1994).

This amendment changed the funding of police pensions in two ways. First, the amendment changed the beginning date of the 40-year amortization period from January 1, 1980, to July 1, 1993. Second, the amendment changed the method of computing the annual amount required to amortize the unfunded accrued liability from a level dollar amount to a percentage of payroll.

Plaintiffs filed a complaint in the circuit court seeking declaratory and injunctive relief and alleging that the amendment violated the Illinois Constitution. Specifically, plaintiffs alleged that the amendment violated section 5 of article XIII, which provides:

"Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

Plaintiffs' complaint alleges that the refinancing allowed by the amendment to section 3—127 diminishes and impairs the pension benefits of participants because it will allow municipalities to contribute lower initial annual contributions to the police pension funds, thereby making the funds less secure.

Plaintiffs subsequently filed a motion for summary judgment. In support of the motion, plaintiffs submitted the affidavit of Arthur Tepfer, who is a professional actuary. In his affidavit, Tepfer states that the amendment to section 3—127 will allow municipalities to defer contributions until later years. Under this new funding method, Tepfer opines that police pension funds will be detrimentally affected because municipal contributions will be initially insufficient to pay the interest on a par-

ticular fund's unfunded liability. Thus, under the new funding provision, pension liabilities will increase dramatically in the early years and a fund will have fewer assets, thereby producing a less secure fund. In his affidavit, Tepfer concludes that the funding changes diminish and impair the pension benefits of the funds' participants.

Plaintiffs further argued that the circuit court should follow the reasoning in *McDermott v. Regan*, 82 N.Y.2d 354, 624 N.E.2d 985, 604 N.Y.S.2d 890 (1993), in which the highest court of New York construed the protection afforded by a similar provision in the New York Constitution (see N.Y. Const. of 1938, art. V, § 7). At issue was whether the legislature may force the comptroller, who is the administrative head of New York's pension funds, to use a controversial method of computing employer contributions. *McDermott*, 82 N.Y.2d at 360, 624 N.E.2d at 988, 604 N.Y.S.2d at 893. The court held that the statute was unconstitutional because it impaired pension benefits by divesting the state comptroller of the autonomy necessary to act as an independent trustee of the funds. *McDermott*, 82 N.Y.2d at 360, 624 N.E.2d at 988, 604 N.Y.S.2d at 893. The court further held that the legislature violated its fiduciary duty as a secondary trustee in changing the funding method solely to alleviate the fiscal crisis in the state. *McDermott*, 82 N.Y.2d at 361-63, 624 N.E.2d at 988-90, 604 N.Y.S.2d at 893-95.

In their reply to the motion for summary judgment, defendants did not contest the nature of funding changes made by the amendment. Instead, relying on the transcripts from the constitutional convention, the defendants argued that section 5 of article XIII only protects pension benefits and does not require any particular method of funding. Defendants noted that in *People ex rel. Illinois Federation of Teachers v. Lind-*

*berg*, 60 Ill. 2d 266, 271 (1975), this court reviewed the record of proceedings from the constitutional convention and determined that the tenor of the debates was concerned with protecting employee benefits, not funding. As the amendment to section 3—127 did not serve to reduce the benefits due any beneficiary, defendants argued there was no violation of the constitution.

The trial court granted plaintiffs' motion for summary judgment. In so ruling, the trial court relied heavily on the *McDermott* case and the opinion of plaintiffs' expert that the funding changes diminish and impair the pension benefits of the funds' participants. Defendants appealed directly to this court pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). We allowed the Illinois Municipal League to file a brief as *amicus curiae* in support of defendants.

## ANALYSIS

Defendants argue that the trial court erred in granting plaintiffs' motion for summary judgment. Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with the affidavits, demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1994). As defendants raise no factual issues, the sole issue on appeal is whether the trial court properly determined as a matter of law that the amendment to section 3—127 violated the Illinois Constitution. The review of a summary judgment ruling is an issue of law and our review is therefore *de novo. Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333 (1996); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390 (1993).

Our inquiry into the protection afforded to state and municipal employees by our constitution appropriately begins with the language of the provision itself. The

plain language of section 5 of article XIII makes participation in a public pension plan an enforceable contractual relationship and also demands that the "benefits" of that relationship "shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5. This court has held that the contractual relationship is governed by the actual terms of the Pension Code at the time the employee becomes a member of the pension system. *Di Falco v. Board of Trustees of the Fireman's Pension Fund of the Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988); *Kerner v. State Employees' Retirement System*, 72 Ill. 2d 507, 514 (1978).

Defendants do not dispute that section 5 of article XIII of the Illinois Constitution creates contractual rights. Defendants contend, however, that the provision creates a contractual right to pension benefits, but does not encompass how those benefits are funded. The defendants note that the language of the provision specifically protects "benefits" and does not mention a particular funding method. Plaintiffs, in contrast, argue that the "benefits" that are protected by the constitution include the full benefits of a contractual relationship under the Pension Code. Plaintiffs argue that the amendment to section 3—127 violated their constitutionally protected contractual right to the "benefit" of the more secure fund created by the prior funding method.

Any uncertainty in the protection afforded by section 5 of article XIII is easily dispelled by an examination of the history of the provision and the evils it was intended to address. Prior to the adoption of the Constitution of 1970, Illinois adhered to the traditional classification of pension plans as either mandatory or optional. Where an employee's participation in a pension plan was mandatory, the rights created in the relationship were considered in the nature of a gratuity that could be revoked at will. See, *e.g., Bergin v. Board*

*of Trustees of the Teachers' Retirement System*, 31 Ill. 2d 566, 574 (1964); *Jordan v. Metropolitan Sanitary District of Greater Chicago*, 15 Ill. 2d 369, 382 (1958); *Blough v. Ekstrom*, 14 Ill. App. 2d 153, 160 (1957). However, where the employee's participation in a pension plan was optional, the pension was considered enforceable under contract principles. *Bardens v. Board of Trustees of the Judges Retirement System*, 22 Ill. 2d 56, 60 (1961); *People ex rel. Judges Retirement System v. Wright*, 379 Ill. 328, 333 (1942). The primary purpose behind the inclusion of section 5 of article XIII was to eliminate the uncertainty surrounding public pension benefits created by the distinction between mandatory and optional pension plans. 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2925 (comments of Delegate Green) (hereinafter cited as Proceedings). This concern was exacerbated by the proposed creation of broad home rule powers for municipalities, which some delegates feared could lead municipalities into debt and result in their abandoning their pension obligations to police officers and fire fighters. 4 Proceedings 2926.

The transcripts from the convention make clear that the purpose of the amendment was to clarify and strengthen the right of state and municipal employees to receive their pension benefits, but not to control funding. In the debates surrounding the amendment, Delegate Parkhurst expressed his concern that the provision may be construed as constitutionalizing the politically sensitive area of pension funding:

> "Now here's—it seems to me—the fallacy of trying to constitutionalize this sort of a thing. First of all, the background in the legislature has been that many people who are entitled to a pension which is administered or given at the state level have come to Springfield and said, 'Our pension is not fully funded. Our actuary tells us that you will have to have $2,200,000,000 in state money to put into a special fund to pay off the potential claims that

may now be filed to get this particular pension or that particular pension when the benefits become due and payable to the retirees.'

And the legislature has said, 'For Heaven's sake, we don't have $2,200,000,000. Why can't you let us run it like the federal government runs the Social Security program, which is to pay the benefits out of the income as they become due.' And the proponents of 100 percent funding have said, 'Nope, that's not good enough. We want you to put all the money there right now, and not wait until the payment comes due before you wrestle up the money to make the payment.'

\*\*\*

Now, the trouble with this amendment is, as I read it, that you would eliminate the argument constitutionally. You would mandate the General Assembly to put in 100 percent of the money to pay anybody's pension on anybody's actuarial projection right now, because it says, 'the benefits of which shall not be diminished or impaired.' " 4 Proceedings 2926-27.

In response to the concerns raised by Delegate Parkhurst, Vice President Lyons asked for a clarification of the nature of the protection afforded:

"I would like to ask one of the sponsors of the amendment—I am a cosponsor of it myself—I *thought* that the purpose of this amendment was to give protection to those people who felt that they needed protection for their pension rights in the event that sweeping home rule powers were given to local governments. I recall receiving a flurry of letters and telephone calls early in the session when the local government articles began to be introduced from police and fire associations who were very fearful that a general grant of home rule powers to local governments might in some way impair their pension rights. I thought that all that this amendment was designed to do was to cure that. Now, if it does something else, or if the language needs to be cleaned up, that's one thing. But the genesis of the amendment, I thought, was simply to protect people who up until now have felt protected. I am aware of no movement to upfund all the funds—nobody's got that kind of money.

I would just appreciate an answer from somebody who feels that he knows." (Emphasis in original.) 4 Proceedings 2928.

Delegate Kinney, who initiated the amendment, was allowed to clarify:

"Yes, you are right, Mr. Lyons. That is what it is designed to do. Benefits not being diminished really refers to this situation: If a police officer accepted employment under a provision where he was entitled to retire at two-thirds of his salary after twenty years of service, that could not subsequently be changed to say he was entitled to only one-third of his salary after thirty years of service, or perhaps entitled to nothing. *That is the thrust of the word 'diminished.' It was not intended to require 100 percent funding or 50 percent or 30 percent funding or get into any of those problems, aside from the very slim area where a court might judicially determine that imminent bankruptcy would really be impairment.*
\*\*\*

\*\*\* It is simply to give them a basic protection against abolishing their rights completely or changing the terms of their rights after they have embarked upon the employment—to lessen them." (Emphasis added.) 4 Proceedings 2629.

Later, Delegate Kinney stated:

"All we are seeking to do is to guarantee that people will have the rights that were in force at the time they entered into the agreement to become an employee, and as Mr. Green has said, if the benefits are $100 a month in 1971, they should be not less than $100 a month in 1990." 4 Proceedings 2931-32.

Delegate Green, also a sponsor of the amendment, discussed the similarity of the proposed amendment to the New York provision. Delegate Green noted, however, that unlike the New York provision, the amendment was not intended to require funding directly. Instead, the amendment was intended to force the funding of the pensions indirectly, by putting the state and municipal governments on notice that they are responsible for those benefits:

"Our language is that language that is in the New York Constitution which was adopted in 1938, really under a similar circumstance. In 1938 you were about at the end of the Depression, but there was a great consideration on the part of the New York General Assembly to really cut out some of the money that they were giving to the pension programs in New York; and it was for this reason that the New York Constitution adopted the language that we are suggesting. Since that time, the state of New York—the pension funds for public employees have been fully funded, and so I think we have good reason to believe that this type of language will be a mandate to the General Assembly to do something which they have not previously done in some twenty-two years.

*Now, we are not in any way suggesting that this $2,500,000,000 that they are in arrears be brought up to date at any one time. The New York Constitution mandated that state to fully fund the program in two years. This would be a physical impossibility in Illinois.*

I do believe that if we could contact the actuary of the programs, it may well be in the scheduling, we could come up with a scheduling to do it. *But in lieu of a scheduling provision, I believe we have at least put the General Assembly on notice that these memberships are enforceable contracts and that they shall not be diminished or impaired.*" (Emphasis added.) 4 Proceedings 2925.

Vice President Lyons' fears were allayed by the comments of Delegates Green and Kinney:

"We now have heard from the proponents who have represented that that is the limit of the scope of this amendment. *It does not refer to upfunding, nor does it seek to establish some sort of an administrative elite to administer these various funds.*" (Emphasis added.) 4 Proceedings 2929.

Echoing Vice President Lyons, Delegate Whalen also reiterated that the funding of the pension systems was outside the scope of the amendment:

"Mr. President and fellow delegates, I agree with Delegate Kinney, that as I read section 16, *it doesn't require the funding of any pensions, and therefore the whole ques-*

*tion of funding is irrelevant to the issue of whether we should adopt the provision.*" (Emphasis added.) 4 Proceedings 2929.

President Witwer expressly conditioned his vote on the understanding that the amendment was not intended to control funding:

"I am voting yes in the hope that the points which Mr. Whalen has raised will be properly protected in the work of the Style and Drafting Committee and that there will be an affirmation that *this does not direct or control funding. I vote yes.*" (Emphasis added.) 4 Proceedings 2932.

Thus, the framers of the Illinois Constitution set out only to put state and municipal governments on notice that they may not abandon their pension obligations on the belief that such payments were gratuities. The clearly expressed intention of the framers was to protect public pension benefits, but not to control funding.

In *People ex rel. Illinois Federation of Teachers v. Lindberg*, 60 Ill. 2d 266 (1975), this court relied on these debates and similarly concluded that section 5 of article XIII of the Illinois Constitution of 1970 does not require any particular level of funding. In *Lindberg*, participants in several teachers' pension funds challenged then Governor Walker's item reduction of fiscal appropriations made to their respective funds. The pension fund participants argued that the Pension Code establishes and defines a contractual relationship between themselves and the state which obligates the state to fulfill its funding commitments. *Lindberg*, 60 Ill. 2d at 271-72. This court rejected that view, noting that "the convention debates do not establish the intent to constitutionally require a specific level of pension appropriations during a fiscal period." *Lindberg*, 60 Ill. 2d at 272. This court concluded that section 5 of article XIII does not create a contractual basis for participants to expect a particular level of funding, but only a contractual right "that they would receive the money due them at the time of their retirement." *Lindberg*, 60 Ill. 2d at 271.

It is with this understanding of the protection afforded by section 5 of article XIII that this court has consistently invalidated amendments to the Pension Code where the result is to diminish benefits. See, *e.g., Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158 (1985) (finding unconstitutional an amendment to Pension Code that changed the salary base for determining pension benefits); *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99 (1987) (finding unconstitutional an amendment to Pension Code that eliminated a participant's right to purchase military service credits to increase benefits at retirement). Similarly, the appellate court has also invalidated amendments to the Pension Code only where the result was to diminish benefits. See, *e.g., Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833 (1979) (finding unconstitutional an amendment to Pension Code reducing the benefits paid to a beneficiary who changes from disability retirement to regular retirement); *Schroeder v. Morton Grove Police Pension Board*, 219 Ill. App. 3d 697 (1991) (finding unconstitutional an amendment to Pension Code that reduced pension benefits based upon receipt of worker's compensation benefits).

In finding that the amendment to section 3—127 violated section 5 of article XIII, the trial court relied on the *McDermott* case from New York and the opinion contained in the affidavit of Arthur Tepfer, the professional actuary. We recognize that in the past this court has relied upon the interpretations given by the New York courts concerning their provision. *Buddell*, 118 Ill. 2d at 106-07; *Felt*, 107 Ill. 2d at 163. In those cases, this court was faced with the issue of whether a particular change in the Pension Code diminished the benefits owed a beneficiary, a matter treated similarly by both constitutions. However, the framers of our constitution

acknowledged that the New York provision was broader than the provision proposed in Illinois, expressly requiring full funding in two years. 4 Proceedings 2925. The framers did not include the funding provision that is contained in the New York Constitution, but adopted the rest of the language with the understanding that it protected only benefits. Delegate Kinney stated:

> "But I would say that the New York Constitution adopted such a provision in 1938, and this amendment is substantially the same language as the New York Constitution presently has. *The thrust of it is that people who do accept employment will not find at a future time that they are not entitled to the benefits they thought they were when they accepted the employment.*" (Emphasis added.) 4 Proceedings 2931.

The clearly expressed intentions of the framers of the Illinois Constitution must control over any discordant interpretation from a sister state. The framers of our constitution simply did not intend that section 5 of article XIII control the manner in which state and local governments fund their pension obligations. In addition, although plaintiffs' expert may express his professional opinion concerning the propriety of the changes in funding, he may not interpret the Illinois Constitution.

We therefore hold that the amendment to section 3—127 does not violate section 5 of article XIII of the Illinois Constitution. Section 5 of article XIII creates an enforceable contractual relationship that protects only the right to receive benefits. Plaintiffs do not contend that the amendment to section 3—127 diminished their right to receive pension benefits. In addition, plaintiffs' complaint does not allege that the new funding method will impair benefits by placing a fund on the verge of default or imminent bankruptcy. See 4 Proceedings 2926 (comments of Delegate Kinney) ("The word 'impaired' is meant to imply and to intend that if a pension fund would be on the verge of default or imminent bank-

ruptcy, a group action could be taken to show that these rights should be preserved"). Accordingly, the circuit court erred as a matter of law in granting plaintiffs' motion for summary judgment.

## CONCLUSION

For the reasons stated, we hold that the amendment to section 3—127 does not violate section 5 of article XIII of the Illinois Constitution. Accordingly, the judgment of the circuit court of Cook County is reversed and the cause is remanded to the circuit court for further proceedings.

*Reversed and remanded.*